IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

UNITED STATES OF AMERICA          )
                                  )
        v.                        )          1:11cv1222 (LMB)
                                  )          1:09cr105 (LMB)
JOSEPH R. BEILHARZ,               )
                                  )
        Defendant.                )
                                  )

MEMORANDUM OPINION

Defendant Joseph R. Beilharz ("Beilharz") has filed a

Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct

Sentence by a Person in Federal Custody [Dkt. Nos. 56 and 62],

which has been fully briefed by the parties.  The Government's

opposition includes an affidavit from defense counsel, Chong C.

Park, Esq.  For the reasons discussed below, the Motion will be

denied.[1]

I.    BACKGROUND

On February 26, 2009, Beilharz was indicted on one count of

conspiracy to commit arson in violation of 18 U.S.C. § 844(n);

two counts of mail fraud in violation of 18 U.S.C. § 1341; and

---

[1] Beilharz has submitted over one hundred pages of pleadings and
exhibits related to his Motion in which he raises dozens of
allegations related to his counsel's purportedly defective
representation.  Because many of those issues plainly do not
meet the standard for constitutionally ineffective assistance of
counsel, this Memorandum Opinion will address only a subset of
the allegations.

one count of money laundering in violation of 18 U.S.C. § 1957. The charges arose from a July 5, 2007 fire that destroyed Beilharz's wife's retail store, Deadwood Liquidators, located in Fairfax, Virginia.  The Government's evidence showed that Beilharz hired a friend, Todd Levesque, and Levesque's girlfriend, Amber Means, to set fire to the store so Beilharz could collect the insurance proceeds.  Both Levesque and Means cooperated with the Government and testified against Beilharz at trial.  Defense counsel Chong C. Park, Esq. was appointed pursuant to the Criminal Justice Act to represent Beilharz throughout the proceedings, including on appeal.

A jury found Beilharz guilty on all four counts after a three-day trial.  He was sentenced to 92 months imprisonment on each count, to run concurrently; 3 years of supervised release; $400 in special assessments; and $1,030,425.02 in restitution. The Government also obtained a consent order of forfeiture in the amount of $85,000.  Beilharz appealed the judgment, arguing that the Court had improperly permitted expert testimony in the Government's rebuttal case.  On May 13, 2010, the United States Court of Appeals for the Fourth Circuit affirmed Beilharz's conviction without oral argument, the mandate issuing on June 4, 2010.  The United States Supreme Court denied his petition for writ of certiorari on November 8, 2010, and Beilharz timely

filed the pending Motion to Vacate one year later, on November 8, 2011.

## II. STANDARD OF REVIEW

A motion under 28 U.S.C. § 2255 provides for collateral attack on a conviction or sentence that was imposed in violation of the United States Constitution or laws, where the court lacked jurisdiction to impose the sentence, where the sentence was in excess of the maximum authorized, or where the sentence or conviction is otherwise subject to collateral attack. To prevail on a § 2255 motion, a movant bears the burden of proving his grounds for collateral relief by a preponderance of the evidence. Vanater v. Boles, 377 F.2d 898, 900 (4th Cir. 1967).

Relief under 28 U.S.C. § 2255 is designed to correct for fundamental constitutional, jurisdictional, or other errors, and it is therefore reserved for situations in which failing to grant relief would otherwise "inherently result [] in a complete miscarriage of justice." United States v. Addonizio, 442 U.S. 178, 185 (1979) (quoting Hill v. United States, 368 U.S. 424, 428 (1962)). Moreover, a motion pursuant to § 2255 "may not do service for an appeal," and claims that have been waived are therefore procedurally defaulted unless the movant can show cause and actual prejudice. United States v. Frady, 456 U.S. 152, 165-67 (1982). An exception applies, however, when a defendant brings a claim of constitutionally ineffective

3

assistance of counsel.  See United States v. DeFusco, 949 F.2d
114, 120-21 (4th Cir. 1991); see also United States v. Martinez,
136 F.3d 972, 979 (4th Cir. 1998) ("A defendant can raise the
claim of ineffective assistance of counsel in three ways: (1) in
a motion for a new trial based on anything other than newly
discovered evidence; (2) on direct appeal if and only if it
conclusively appears from the record that his counsel did not
provide effective assistance; or (3) by a collateral challenge
pursuant to 28 U.S.C. § 2255.").

To sustain a § 2255 motion based on ineffective assistance
of counsel, Beilharz must satisfy the two-pronged test set forth
in Strickland v. Washington, 466 U.S. 668 (1984), which requires
a showing of both deficient performance by counsel and prejudice
to the defendant.  Because it "is all too tempting for a
defendant to second-guess counsel's assistance after conviction
or adverse sentence" and because a wide range of legitimate
defense strategies are possible in a given case, "scrutiny of
counsel's performance must be highly deferential."  Id. at 689.
Even if counsel's performance was unreasonable, to prevail on a
motion to vacate a defendant must affirmatively "show that there
is a reasonable probability that, but for counsel's
unprofessional errors, the result of the proceeding would have
been different. A reasonable probability is a probability
sufficient to undermine confidence in the outcome."  Id. at 694.

4

Beilharz can meet neither of the <u>Strickland</u> prongs as to any of his ineffective assistance of counsel claims.

### III. DISCUSSION

#### A. <u>Interstate Nexus Requirement</u>

Beilharz first contends that defense counsel's performance was defective because he did not argue that the Government had failed to prove the interstate commerce element of 18 U.S.C. § 844(i).[2]  Specifically, Beilharz maintains that Deadwood Liquidators was not actively used in interstate commerce at the time of the fire due to its dwindling business and, accordingly, the interstate nexus element was not met.  In support of this contention, Beilharz relies on <u>Jones v. United States</u>, 529 U.S. 848 (2000), in which the Court set forth a two-step inquiry to determine whether a building subject to arson is covered by the federal arson statute.  A court must first look to "the function of the building itself, and then [make] a determination of whether that function affects interstate commerce."  <u>Id.</u> at 854 (citation omitted).  On the facts before it, the Supreme Court held that "an owner-occupied residence not used for any

---

[2] Beilharz was convicted of conspiracy to commit arson under § 844(n).  Section 844(i) is the substantive arson provision, which prescribes the penalties for a person who "maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an explosive, any building, vehicle, or other real or personal property <u>used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce</u>" (emphasis added).

commercial purpose does not qualify as property 'used in'
commerce or commerce-affecting activity," and therefore is not
within the ambit of the federal arson statute, 18 U.S.C.
§ 844(i). Id. at 850-51. The Court went on to hold that the
statutory language "used in" interstate commerce or commerce-
affecting activity requires "active employment for commercial
purposes, and not merely a passive, passing, or past connection
to commerce," and that the statute thus "covers only property
currently used in commerce or in an activity affecting
commerce." Id. at 855.

In interpreting § 844(i), "[t]he phrases 'currently used'
and 'active employment' [as used in Jones] cannot sensibly be
read to mean 'open for business at the precise moment in time
when the match is struck.'" United States v. Troy, 618 F.3d 27,
32 (1st Cir. 2010). Accordingly, that a business was closed on
the day of a fire, or was closed periodically during a given
week, does not establish that the building was not "actively
employed" in interstate commerce. The Second Circuit has
similarly declined to "adopt an overly literal reading of the
'active employment'" terminology of Jones. See United States v.
Iodice, 525 F.3d 179, 184 (2d Cir. 2008). The Iodice court held
that because "commercial buildings—specifically, restaurants and
rental properties—do not necessarily relinquish their
relationship with interstate commerce for purposes of § 844(i)

6

due merely to the fact that they are temporarily vacant," a diner that had been vacant for one and a half years, and likely would remain vacant for at least six additional months, nevertheless met the active employment requirement given the owner's "active preparation to bring the diner into the stream of commerce." Id. at 184-85.[3]

Beilharz argues that the Government's evidence demonstrated that Deadwood Liquidators was not in business on the day of the fire and therefore the "active employment" requirement was not met, though he concedes that the building was "originally leased for the purpose of establishing a retail business" and that in 2006, when business was stronger, it met the interstate nexus requirement of § 844(i).  Mot. to Amend at 4-5 [Dkt. No. 62].

In support of his interstate nexus argument, Beilharz focuses primarily on Government Exhibit 33, to which defense counsel stipulated.  Exhibit 33 is a summary spreadsheet listing

---

[3] Beilharz relies heavily on United States v. Ryan, 227 F.3d 1058 (8th Cir. 2000), in which the Eighth Circuit found that a building recently used as a fitness center was not being "used in" an activity affecting commerce at the time of the fire.  The facts of Ryan are clearly distinguishable from the instant case. In Ryan, the fitness center at issue had been officially closed for nearly a month at the time of the fire, and the owners had "beg[u]n taking steps to sell the business."  Id. at 1060.  The only interstate connections were an out-of-state owner of the business and the building receiving natural gas from an out-of-state supplier, which the court held to be an insufficient interstate nexus.  Deadwood Liquidators had a much more substantial connection to interstate commerce, as elaborated further in this opinion.

7

Deadwood Liquidators' purchases of inventory from Internet retailer <liquidation.com>. Among other things, the spreadsheet reflects dates of various transactions and the out-of-state location of the respective merchandise sellers. Beilharz argues that, because the vast majority of these inventory purchase transactions occurred in 2006 and the most recent occurred in March of 2007, the Government's evidence did not show that Deadwood Liquidators was in business on July 5, 2007, the day of the fire. See Mot. to Amend at 5.[4] He also relies on various Government witnesses who testified that, when they visited Deadwood Liquidators in the months leading up to the fire, the store was closed.

To be sure, the evidence at trial demonstrated that Deadwood Liquidators was a struggling business in July 2007. See, e.g., Apr. 27, 2009 Tr. at 33:5-37:14, 38:9-40:13 (testimony of Williams Meter Service and Dominion Virginia Power representatives detailing unsuccessful efforts to turn off gas and power service at Deadwood Liquidators due to multiple months of nonpayment). Despite the business having apparent financial difficulties, however, the evidence clearly established that Deadwood Liquidators was operating for commercial purposes in the months preceding the fire. For example, the store was

---

[4] Beilharz similarly challenges counsel's decision to stipulate to the potential testimony of a representative of the website.

stocked with merchandise on the day of the fire; inventory had been ordered from out-of-state suppliers as recently as March 2007, less than four months before the fire; the store was open to customers five days per week; and the business had both walk-in and Internet customers around the time of the fire. See Park Aff. at 2-4.

Jeanette Beilharz, the defendant's wife, testified that business was "flat," meaning that "[i]t wasn't expanding, and it wasn't shrinking." Apr. 28, 2009 Tr. at 180:5-9. She explained that the business was open five days per week for varying hours, "depending on customer flow," and that she was present at the store for "some stretch of time" each of those days through June of 2007. Id. at 173:13-16; 192:23-193:4. Beilharz's own witness thus refuted his current argument that Deadwood Liquidators was essentially out of business. Moreover, the Court declines to find that a store is outside the stream of commerce merely because it has not purchased new inventory in several weeks. To the contrary, it is entirely logical for a business with difficulty selling its current merchandise to delay ordering new inventory until business improves.

Although Beilharz argues that, in light of the Government's evidence showing little commercial activity in early 2007, it was unreasonable for Park to elicit contrary testimony from Jeanette Beilharz that now undermines his interstate nexus

9

argument, he also admits that this was a "strategic choice" by counsel "designed to contradict the government's effort to show motive." Mot. to Amend at 10. Indeed, Park explains in his affidavit that Jeanette Beilharz's testimony was necessary to rebut the Government's theory and evidence of motive: that the defendant sought to burn down the building because the business was failing and that the store had been stocked with inventory before the fire to increase the amount of the insurance claim. Beilharz argues that evidence of alternate sources of his and his wife's income could have countered the Government's theory of motive without showing ongoing commercial activity. Ultimately, he takes issue with his attorney's strategic choice of how to most effectively counter the Government's theory of the case. Although Beilharz may disagree with this strategy in hindsight, such second-guessing does not establish constitutionally incompetent assistance of counsel.[5]

---

[5] One of Beilharz's primary theories of defense at trial was that another person had in fact coordinated the arson due to a personal grudge against the Beilharzes. Although not articulated in Park's affidavit, it is certainly a reasonable defense strategy to focus on a substantive defense of innocence rather than on a technical legal argument such as the interstate nexus, which has a slim chance at success in light of current case law. As the Fourth Circuit has observed, a "fundamental reality of trial practice is that 'often, a weak witness or argument is not merely useless but, worse than that, may detract from the strength of the case by distracting from stronger arguments and focusing attention on weaknesses.'" United States v. Terry, 366 F.3d 312, 318 (4th Cir. 2004) (quoting Epsom v. Hall, 330 F.3d 49, 53 (1st Cir. 2003)).

10

Because there was evidence of Deadwood Liquidators being engaged in interstate commerce at the time of the fire, defense counsel's failure to challenge the existence of an interstate nexus was not unreasonable.[6]  Nor can Beilharz satisfy the prejudice prong of Strickland.  A weak business is not outside the realm of interstate commerce when the owner continues her attempts to engage in commercial activity and plans for the business to continue.  Consistent with this understanding, defense counsel has represented that he believed before trial that the Government would have been able to prove the interstate nexus element even had he not stipulated to evidence on this

---

[6] Beilharz also argues that his attorney should have challenged the jury instructions on the interstate nexus requirement for the arson and money laundering charges.  His primary argument appears to be that, because both the arson count and the money laundering count include interstate commerce elements, "counsel should have argued for more definitive instructions to provide clarity and balance between these two instructions."  Mot. to Amend at 13.  This contention is without merit.  When instructing the jury, the Court clearly explained each interstate commerce element in the context of the appropriate count.  The arson count (Count I) was discussed entirely separately from the money laundering count (Count IV).  See Apr. 29, 2009 Tr. at 29:25-30:3 (Count I definition); 38:17-39:2 (Count IV definition).  The language used in the instructions was taken directly from Fourth Circuit case law and Sand's Modern Federal Jury Instructions.  See United States v. Terry, 257 F.3d 366, 369 (4th Cir. 2001) (arson statute) and 3-50A L. Sand, et al., Modern Federal Jury Instructions—Criminal § 50A-27 (Matthew Bender) (money laundering statute).  Accordingly, there is no basis for Beilharz's claim that counsel was ineffective in failing to challenge these jury instructions.

point.  For all of these reasons, Beilharz's claim of
ineffective assistance of counsel on this issue fails.

B. Failure to Challenge Lieutenant Whitacre's Testimony
   Regarding Phone Record Evidence

Beilharz next contends that defense counsel should have
challenged the Government's use of Lieutenant Whitacre, the lead
arson investigator in the case, to explain a summary of cell
phone record evidence.  Lieutenant Whitacre was qualified as an
expert in fire investigations so he could opine on the cause of
the fire, but he was not qualified as an expert in cell phone
technology.  Beilharz argues that counsel's failure to object to
Whitacre's cell phone testimony allowed the jury to hear
"continuous testimony from a witness qualified by the Court as
an expert...[and] the uninterrupted testimony implicitly
conveyed to the jury that Whitacre's expertise included this
field of technology."  Beilharz Mem. at 6.  Beilharz maintains
that "historical cell cite analysis," which is used to pinpoint
the location of a cell phone, is a recognized technological
field and, as such, a qualified expert is required to testify to
such evidence.

The cell phone evidence was introduced to show Beilharz's
whereabouts and telephone conversations on July 4, 2007 when he
met and spoke with his co-conspirators.  Jeanette Beilharz's

cell phone records[7] obtained directly from Sprint Nextel were received into evidence as Government Exhibit 34, without objection from the defense.  Exhibit 34 included a page titled "Key to Understanding Viador Reports" ("key"),[8] which explained terms used in the records, including "first cell" and "last cell."  "First cell" and "last cell" refer to the cell sites from which the phone call was initiated and terminated, respectively.  Information in the records includes incoming and outgoing call data for the cell phone, phone numbers dialed, call date, start and end times, and the first and last cell sites.  The Sprint Nextel documents also included a list of cell site numbers and their associated street addresses.  Lieutenant Whitacre testified that he utilized the information in the Sprint Nextel records to associate the location of the cell towers with certain calls and call times.  See Apr. 27, 2009 Tr. at 74:20-75:2.  He created a summary chart reflecting this compiled information for calls made on July 4, 2007 between 5:04 p.m. and 8:04 p.m.  See Gov't Ex. 37.

---

[7] Although the phone number in question was registered to his wife, following the fire Beilharz provided Lieutenant Whitacre with the same number as his contact number.  See Apr. 27, 2009 Tr. at 59:4-12.

[8] The records explain that a Viador Report "lists information about incoming/outgoing calls including the digits dialed on the handset."

In his affidavit, defense counsel correctly argues that because Lieutenant Whitacre did not testify as to the technical aspects of cell phone operation, but merely how he compiled the summary chart, his testimony was properly admissible as generally relevant evidence under Fed. R. Evid. 401. See Park Aff. at 5. The only exchange in which Whitacre arguably gave a technical explanation was:

> Q: So when you're referring to cell phone towers, what do you mean by that?
>
> A: Well, to make the cell phone work, it has to, I guess, relay a signal from a cell tower to another cell phone, so it makes a record of that capture on your cell phone records.
>
> Q: In other words, when the phone's in use, does it hit a certain tower?
>
> A: Yes.

Apr. 27, 2009 Tr. at 75:9-16. Although describing in general terms what a cell tower is, this information is far from the technical testimony which requires a qualified expert. Fed. R. Evid. 701 permits lay opinion testimony that is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Lieutenant Whitacre provided only a brief and generic description of the role of cell phone towers consistent with information available

14

to the general public.  That cell phones send signals to towers, thereby indicating the user's general location, does not qualify as expert testimony "beyond the realm of common experience and which require[s] the special skill and knowledge of an expert witness."  Certain Underwriters at Lloyd's, London v. Sinkovich, 232 F.3d 200, 203 (4th Cir. 2000) (citation omitted).

Moreover, Beilharz's contention that Lieutenant Whitacre's "uninterrupted testimony" implied that he was an expert in both fire investigation and cell phone technology is directly contradicted by the record.  The bulk of Whitacre's cell phone-related testimony occurred during direct examination on April 27, 2009; he was not qualified as a fire investigation expert until redirect examination by the Government later that day. His second brief segment of testimony regarding the cell phone records occurred the following day, April 28, 2009.[9]  In addition to the overnight adjournment, between the time Whitacre was qualified as an arson expert and his second set of cell phone testimony, excerpts of Beilharz's deposition testimony were read into the record and co-conspirator Amber Means testified at length.  This sequence of events hardly qualifies as "uninterrupted" testimony that could suggest that Whitacre's expertise in fire investigation meant he was also an expert in

---

[9] The break in Lieutenant Whitacre's testimony was due to a clerical issue with one of the cell phone record exhibits, which the Government cured overnight.

15

cell phone technology.  Moreover, the Government explicitly

offered Whitacre as an expert in the field of fire

investigations only in order to elicit his opinion as to the

cause of the fire.

     In addition, defense counsel explains that the cell phone

records were not inconsistent with the proffered theory of

defense, which did not deny that Beilharz had communicated and

met with the co-conspirators at the known times and places, but

instead theorized that Beilharz had contacted them for purposes

other than planning the arson.  See Park Aff. at 5-6.  For all

of these reasons, Beilharz's claim of ineffective assistance of

counsel based on counsel's failure to challenge the testimony of

Lieutenant Whitacre fails.

### C. Defense Counsel's Introduction of Arson Reports on Cross-Examination

     Beilharz argues that defense counsel erred when he

introduced Bureau of Alcohol, Tobacco, Firearms and Explosives

("ATF") arson laboratory reports in cross-examination of

Lieutenant Whitacre, as the reports opened the door to the

Government's use of expert witnesses in rebuttal.[10]  Although

Beilharz now argues that the trade-off between introducing the

---

[10] Defense counsel unsuccessfully objected to the introduction of
such expert testimony on the ground that the experts had only
recently been disclosed to the defense.  On appeal, the Fourth
Circuit affirmed this Court's decision to admit the expert
rebuttal evidence.

reports and risking rebuttal testimony was unwise, counsel's
decision does not constitute constitutionally ineffective
assistance.

Of primary significance, the reports at issue were
advantageous to the defense.  As defense counsel explains in his
affidavit, due to the favorable nature of the reports, "[i]t was
important to get these BATF reports into evidence regardless of
whether the government can attempt to rebut its contents through
its experts."  Park Aff. at 6.  For example, one report
identified no ignitable fluids on a Bud Lite bottle found at the
scene, which the Government alleged was one of the Molotov
cocktails used to start the fire.  Def.'s Ex. 5.  Another
reported that "[t]he materials evaluated in this investigation
are not consistent with an improvised incendiary weapon."
Def.'s Ex. 7.  The Government's rebuttal witness, Raymond Kuk, a
chemist with ATF, explained the laboratory findings, concluding
that "there are various reasons for a negative result, one of
which could be that nothing was there, and the other reasons are
that there might have been evaporation prior to collection."
Apr. 28, 2009 Tr. at 119:23-120:2.  Although Beilharz alleges
that defense counsel failed to vigorously cross-examine Kuk,
counsel elicited the important point that, even after a
substance evaporated, "it would leave some potential residue,"
thus bolstering Beilharz's emphasis on the laboratory's negative

17

findings. Id. at 120:11.  The Government's second rebuttal expert, Michael Eldridge, an explosives enforcement officer at ATF, merely explained that the items recovered from the scene were not improvised incendiary weapons because ignitable fluid was not found on them.  See Apr. 28, 2009 Tr. at 127:5-7.  Given that the ATF arson reports were favorable to Beilharz, it was entirely reasonable for counsel to choose to introduce the reports and risk the Government's rebuttal, which nevertheless proved minimally damaging to the defense.

D. Allegedly Deficient Investigation and Trial Strategy

Beilharz chronicles a series of alleged "missed opportunities" on the part of defense counsel.  In essence, he argues that counsel should have more vigorously cross-examined Lieutenant Whitacre, undertaken certain specific investigative efforts regarding the co-conspirators' stories, and asked different and additional questions of Means and Levesque to discredit their testimony.  He further contends that counsel should have proffered additional evidence to affirmatively counter the Government's case.

Beilharz's claims fail because they rely entirely on the benefit of hindsight and attack defense choices that were part of a reasonable defense strategy.  Trial tactics, including "what evidence should be introduced, what stipulations should be made, [and] what objections should be raised," are generally

within the discretion of defense counsel. United States v. Chapman, 593 F.3d 365, 367-69 (4th Cir. 2010). In this case, defense counsel undertook various lines of attack on the Government's case, including attempts to elicit testimony that the fire could have been started in a manner different from the Government's theory and that a former business acquaintance of the Beilharzes held a grudge and could have been responsible for the fire.

Although Beilharz argues that counsel did not present sufficient evidence to support the latter narrative, the theory was elicited at trial through the testimony of Todd Levesque and Jeanette Beilharz. Levesque testified that Ms. Beilharz sold her former business to an employee named Kenneth McCoy, who was ultimately dissatisfied with the sale and "felt as if he had gotten ripped off." See Apr. 28, 2009 Tr. at 79:1-80:21 (testimony of Todd Levesque). Jeanette Beilharz testified that her husband helped negotiate the terms of the transaction and that, after the sale, McCoy "thought that he was a sucker" and expressed to her his anger and uneasiness. Id. at 141:2-145:3 (testimony of Jeanette Beilharz). Defense counsel maintains that, in his view, the Levesque and Beilharz testimony adequately put forth the theory that McCoy could have been involved with the fire. See Park Aff. at 11. Counsel also argues that the testimony of Jeanette Beilharz provided

19

legitimate explanations for the payments to Levesque and Means,
casting doubt on the Government's theory of arson-for-hire.  See
Park Aff. at 9; see also Apr. 28 Tr. at 149:20-150:1 (testimony
of Jeanette Beilharz that she wrote a $700 check to Amber Means
for Means' and Levesque's car payments); id. at 151:13-152:20
(testimony of Jeanette Beilharz that she wrote a $3,600 check to
Amber Means as a loan for Levesque to start a repossession
business).  Moreover, in cross-examination of Means and
Levesque, defense counsel emphasized for the jury the deals the
witnesses had received from the Government in exchange for their
testimony.  Levesque pled guilty to conspiracy to commit arson
with the hope that he would receive a post-sentencing reduction
in his sentence.  Counsel elicited on cross-examination that,
before pleading guilty, Levesque was "threatened by the
government that they would bring charges, more charges than what
[Levesque] actually pled for," and that he "would end up serving
much more time in prison than for the charge that [he] pled
guilty for."  Apr. 28 Tr. at 73:21-24, 74:2-4.  Means received
an order of immunity in exchange for her testimony.  Defense
counsel elicited that, if her trial testimony differed from her
grand jury testimony, the Government would renew charges against
her.  Apr. 28 Tr. at 20:21-24.  Such cross-examination provided

the jury with reasons to doubt the testimony of the co-
conspirators.[11]

Despite Beilharz's efforts to dissect minute details of the
trial, there is a "a strong presumption that counsel's conduct
falls within the wide range of reasonable professional
assistance; that is, the defendant must overcome the presumption
that, under the circumstances, the challenged action might be
considered sound trial strategy." Strickland, 466 U.S. at 689
(citation omitted). Specific questions asked on cross-
examination and lines of attack on Government witnesses fall
within counsel's realm of reasonably professional discretion.
Moreover, "[t]he argument that the cumulative effect of errors
can establish a claim of ineffective assistance of counsel is
specifically rejected by the Fourth Circuit." Moncrieffe v.
United States, 2012 U.S. Dist. LEXIS 18453, at *7 (E.D. Va. Feb.

---

[11] Beilharz also argues that defense counsel should have employed
a fire science expert to counter the testimony of Lieutenant
Whitacre. According to defense counsel, however, he explicitly
discussed with his client the possibility of using an arson
expert, including use of Criminal Justice Act funds and the
defense's obligation to disclose the expert's report. Park Aff.
at 7-8. In response, Beilharz informed counsel that an expert
was unnecessary and that he "was concerned that an expert could
prove harmful to his defense." Id. at 8. He cannot now claim
that counsel's acquiescence to his request was constitutionally
unreasonable. See Strickland, 466 U.S. at 691 ("[W]hen a
defendant has given counsel reason to believe that pursuing
certain investigations would be fruitless or even harmful,
counsel's failure to pursue those investigations may not later
be challenged as unreasonable.").

21

13, 2012) (citing Fisher v. Angelone, 163 F.3d 835, 852 (4th
Cir. 1988)).

Accordingly, Beilharz's litany of "could have but did not"
arguments about purportedly missed cross-examination questions
and investigative opportunities do not establish incompetent
representation. Moncrieffe, 2012 U.S. Dist. LEXIS 18453, at *8.
This is not an egregious case in which, for example, counsel
failed to interview or present crucial alibi witnesses or
engaged in "unpardonable neglect" in failing to present certain
evidence. See Griffen v. Warden, 970 F.2d 1355, 1358 (4th Cir.
1992). To the contrary, counsel effectively cross-examined the
Government's witnesses and presented coherent alternative
theories of the crime in defense of his client. Even if these
strategic decisions could be classified as unreasonable,
Beilharz cannot show a reasonable probability that he would have
been acquitted had counsel acted differently. For these
reasons, Beilharz cannot satisfy either of the Strickland prongs
required to establish a constitutional violation.

E. Inadequate Explanation for Defendant's Failure to Testify

Beilharz next contends that counsel erred by informing the
jury during his opening statement that his client would testify,
then subsequently advising Beilharz not to do so and providing
the jury with no explanation for the change, other than that

22

Beilharz had "good reason" for not taking the stand.[12]  According
to Beilharz, his decision not to testify, made after the
Government rested, was a result of counsel's advice that the
benefit of testifying would be outweighed by opening the door to
Beilharz's criminal history on cross-examination.  See Beilharz
Mem. at 40.  Specifically, Beilharz takes issue with the fact
that, "in his closing statement, counsel told the jury that
Beilharz had good reason not to testify, but failed to share
with the jury what that reason was," which strategy "served to
dull juror's [sic] perception of Beilharz's character, leaving
them to infer their own conclusions to the apparent stratagem."
Beilharz Mem. at 40.

    According to defense counsel, he and Beilharz had extensive
discussions before and during trial on the pros and cons of
taking the stand.  Counsel represents that his client decided to
testify before the trial began, prompting him to so advise the
jury during his opening statement.  After the Government
completed its case, Beilharz changed his mind and decided not to
testify, a decision which he reiterated in writing during the

---

[12] Transcripts of defense counsel's opening and closing
statements have not been made available.  However, because the
Court finds that counsel's statements do not constitute
ineffective assistance, for purposes of this opinion, the Court
will accept as true Beilharz's representations regarding their
contents.

proceedings and which the Court confirmed in a colloquy outside
the presence of the jury, as follows.

> Q:   [J]ust for the record, Mr. Beilharz, I want to make
> sure that you have discussed thoroughly with Mr. Park your
> options as to whether to testify or not to testify.  Have
> you had a chance to do that?
>
> A:   Yes, ma'am, Your Honor.
>
> Q:   All right.  And is it your decision that you don't
> wish to testify in this case?
>
> A:   Yes, ma'am, Your Honor.
>
> Q:   All right.  I just want to make sure we're clear on
> that for the record.

See Park Aff. at 9-10; Apr. 28, 2009 Tr. at 194:7-16.  As
reported by counsel, he "had no explanation that [he] could, or
should, share with the jury" as to why his client decided not to
testify.  Park Aff. at 10.

It is entirely unclear what Beilharz proposes counsel
should have done to explain his change of heart, as counsel's
statement that his client had "good reason" not to testify was
apparently insufficient in Beilharz's view.  Yet any further
explanation to the jury—specifically, an elaboration on the
reason provided by Beilharz himself, that he was concerned about
introduction of his criminal history—would have released the
very information he sought to keep out.

24

Moreover, the jury was specifically instructed to draw no inference from the defendant's failure to testify.  The instruction provided:

> The defendant in a criminal case has an absolute right under our Constitution not to testify. The fact that the defendant did not testify must not be discussed or considered in any way when deliberating and in arriving at your verdict. No inference of any kind may be drawn from the fact that a defendant decided to exercise his privilege under the Constitution and did not testify.

Apr. 29, 2009 Tr. at 22:3-9.  There is no reason to believe that, had counsel further explained his client's refusal to testify, the outcome of the trial would have been different. This is especially the case given that the truthful explanation may well have reflected unfavorably on his client.

Although it is risky for a defense attorney to mention in his opening statement that his client will testify, on the facts presented here, the Court does not find that counsel's conduct amounted to ineffective assistance.

### F. Counsel's Inexperience in Federal Court and Alleged Failure to Share Discovery Material

Finally, Beilharz argues that he received constitutionally ineffective assistance of counsel because his attorney was inexperienced and did not properly review discovery with him. First, counsel's background was sufficient to qualify him for the Criminal Justice Act panel, which only accepts attorneys with previous criminal defense experience.  Counsel informed his

client of this prior experience, which Beilharz characterizes as
minimal at the federal level. See Park Aff. at 11; Beilharz
Mem. at 44.  Beilharz points to various statements made by the
Court during trial as purportedly corroborating his view that
counsel was inexperienced.  Ultimately, however, the level of an
attorney's experience is irrelevant if the attorney provides
competent representation in the case at hand; inexperience
itself does not constitute ineffectiveness.  The Court also
specifically instructed the jury "to draw absolutely no
inference against the side to whom an admonition of the Court
may have been addressed during the trial."  Apr. 29, 2009 Tr. at
10:1-2.  For these reasons, any claim based on the inexperience
of counsel alone must fail.

Beilharz also argues that counsel did not sufficiently
review discovery with him "thereby depriving [him] of an
opportunity to participate in preparing for his own defense."
Beilharz Mem. at 44.  Counsel acknowledges that, because the
Beilharzes live in Florida and due to the associated logistical
difficulties, he did not meet his client in person until the
morning of trial.  In his sworn affidavit, however, counsel
contends that he acted appropriately in communicating with his
client.  Specifically, he asserts that he and Beilharz
"thoroughly discussed all exhibits, potential witnesses and
defense strategies" and that Beilharz had access to all

26

discovery materials he could properly receive.[13]  As counsel
points out, Beilharz had previously gotten access to much of the
Government's evidence because it was included in the underlying
insurance company investigation.

In contrast, Beilharz avers that counsel never sent him
discovery documents by mail, that he "ha[s] no recollection of
ever receiving any discovery documents by email," and that he
first "saw copies or samples of any of the government's evidence
(other than [his] civil case transcripts)...at trial."  Beilharz
Decl. ¶¶ 6, 8-9.  He maintains that, had he known certain
details of the Government's evidence before trial, he would have
offered alternative explanations that would strengthen his
defense.  For example, he argues that he could have provided an
innocent explanation for "shop[ping] around" for a new insurance
policy months before the trial; that the import of the fire
investigator's contention that the fire was "gas-fed" could have
been diminished by showing that Beilharz had complained to the
gas company about a gas leak; that counsel could have more

---

[13] Beilharz specifically takes issue with counsel's refusal to
show him certain documents from the Government which counsel had
accidentally mailed to him.  According to defense counsel, these
documents were Jencks and Giglio material which he was not
permitted to show to the defendant.  See Park Aff. at 12-13.
The two disagree as to whether Park discussed with Beilharz the
contents of these documents.  Ultimately this dispute is
irrelevant because, as previously discussed, counsel effectively
cross-examined co-conspirators Means and Levesque, to whom the
documents in question apparently related.  Id.

vigorously cross-examined Lieutenant Whitacre about Beilharz's
uncounseled, videotaped interview; that, had Beilharz been aware
of the Government's reliance on the cell phone record evidence,
he "would have insisted on expert consultation...to rebut the
government's theory" and could have noted discrepancies in the
cell site summary chart; and that, had he known of the
interstate nexus requirement for the arson charge, he could have
pointed counsel to the timing of the inventory invoices.
Beilharz Mem. at 45-47.

        Beilharz has thus specified the particular manner in which
his trial was allegedly impacted by counsel's claimed
deficiencies.  However, "[t]he benchmark for judging any claim
of ineffectiveness must be whether counsel's conduct so
undermined the proper functioning of the adversarial process
that the trial cannot be relied on as having produced a just
result," not whether any aspect of the trial would have been
different.  See Strickland, 466 U.S. at 686.  Even assuming that
Beilharz accurately recounts counsel's conduct and that such
actions were objectively unreasonable, Beilharz has not
demonstrated a "reasonable probability that, but for counsel's
unprofessional errors, the result of the proceeding would have
been different."  Id. at 694.  Fatal to Beilharz's claim is the
principle that "[i]t is not enough for the defendant to show
that the errors had some conceivable effect on the outcome of

the proceeding," as "[v]irtually every act or omission of counsel would meet that test...and not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." Id. at 693.

As detailed above, the evidence at trial overwhelmingly supported the jury's finding of guilt, and there is no "reasonable probability that, absent the [alleged] errors, the factfinder would have had a reasonable doubt respecting guilt." Id. at 695. Although it is conceivable that, had counsel accepted Beilharz's recommendations as to each of these pieces of evidence, portions of the Government's case could have been weakened, on the whole, there is no reasonable probability that Beilharz would have been acquitted. Indeed, the Court has already rejected the interstate nexus argument, and as previously discussed, counsel did a competent job challenging the Government's theory as to the cause of the fire and has explained that the cell phone records were not contrary to the theory of defense. For these reasons, the Court finds that any failure of defense counsel to communicate discovery material to his client did not rise to the level of constitutionally ineffective assistance.

## IV.  CONCLUSION

Despite Beilharz's many complaints about counsel's performance, ultimately "[a] defendant is entitled to a fair

trial but not a perfect one, for there are no perfect trials."
Brown v. United States, 411 U.S. 223, 231-32 (1973) (citation,
alteration, and quotation marks omitted). Although defense
counsel may have made tactical choices that appear unwise in
hindsight, the Constitution allows a "wide range of reasonable
professional assistance." See Strickland, 466 U.S. at 689.
Moreover, none of the many alleged errors "undermine confidence
in the outcome" of the trial, thereby precluding a successful
ineffective assistance of counsel claim. See id. at 694. For
these reasons, Beilharz's Motion to Vacate will be dismissed by
an Order to accompany this Memorandum Opinion.

Entered this 12th day of June, 2012.


Alexandria, Virginia

/s/
Leonie M. Brinkema
United States District Judge